HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PREFERRED NUTRITION, INC., et al.,

      Plaintiffs,

    v.

LORNA VANDERHAEGHE, et al.,

      Defendants.

CASE NO. C10-907RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss for lack of personal jurisdiction.  Dkt. ## 9, 13.  Plaintiffs requested oral argument solely on Defendants' motion and Defendants requested oral argument solely on Plaintiffs' motion.  After Defendants' lead counsel was unavailable on the two dates the court offered for oral argument, the parties agreed to waive oral argument.  For the reasons stated below, the court DENIES both motions.

Because this order "grant[s] or den[ies] an interlocutory injunction," the court must make findings and fact and conclusions of law.  Fed. R. Civ. P. 52(a)(2).  The court includes its findings and conclusions in this order, which serves as a memorandum of the court's decision.  Fed. R. Civ. P. 52(a)(1) (permitting findings and conclusions within "an opinion or a memorandum of decision"); *see also FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982) (noting that explicit factual findings are unnecessary).

ORDER – 1

## II.  BACKGROUND

This trademark infringement action arises from the end of a once-harmonious business relationship between Plaintiffs Preferred Nutrition, Inc. ("PNI") and Natural Factors Nutritional Products, Inc. ("NFI") and Defendant Lorna Vanderhaeghe.[1]  That relationship began around 2001, when Canadian[2] Dean Parkes started a new company to sell health supplements.  That company became PNI, a Canadian corporation.  Mr. Parkes had previously worked for the Canadian affiliate of NFI, which manufactured health supplements.  He knew Ms. Vanderhaeghe, another Canadian, who had years of professional and academic experience in nutritional medicine.

Mr. Parkes approached Ms. Vanderhaeghe about starting a women's health supplement line at PNI.  They discussed, but never finalized, a formal agreement governing their collaboration.  Ms. Vanderhaeghe worked as an independent consultant for PNI, helping the company launch a line of women's supplements.  With a few exceptions, each supplement was branded with a name ending in the suffix "Sense," including for example EstroSense, BodySense, and MenoSense.  Each supplement's label bore Ms. Vanderhaeghe's name and a photographic likeness of her.  Ms. Vanderhaeghe had input into the formulation of the Sense products, their packaging, and their marketing.  She made many promotional appearances for the products, including meetings with retailers and distributors.  She also promoted the products on her website.[3]  Eventually, PNI's Canadian Sense line included about 25 different products labeled with Ms. Vanderhaeghe's name and likeness.

---

[1] Plaintiffs also named two corporations under Ms. Vanderhaeghe's control as Defendants. Except where necessary, the court refers solely to Ms. Vanderhaeghe.

[2] Throughout this order, the court uses the adjective "Canadian" to refer to people residing in Canada or products sold in Canada, and uses "American" to refer to people residing in the United States or products sold here.

[3] Ms. Vanderhaeghe owns the domain names healthyimmunity.com and hormonehelp.com. So far as the record reveals, both domains connect to the same website.

ORDER – 2

Not long after PNI launched the first of the Canadian Sense products, NFI began to work with PNI and Ms. Vanderhaeghe to launch a similar product line in the United States. NFI, headquartered in Everett, Washington, was affiliated with the Canadian entity that manufactured PNI's supplements. The parties collaborated to sell about eight of the Sense products in the United States from 2003 to 2008. For most of that time, NFI sold the American Sense line with labels that featured the same product names (*e.g.*, MenoSense, OsteoSense) but did not include Ms. Vanderhaeghe's name or likeness. Nonetheless, Ms. Vanderhaeghe made numerous promotional appearances in the United States to promote the American Sense line. She promoted the line on her website as well.

PNI registered all of the Sense brands as Canadian trademarks, and registered most of them as United States trademarks as well. Ms. Vanderhaeghe disputes whether she authorized PNI to do so. She contends that she owns or partially owns PNI's Sense trademarks. The court will address that issue in its later analysis. For now, it suffices to note that PNI holds or has applied for the United States trademark registrations for all of the American Sense products. PNI has granted NFI a non-exclusive license to use its trademarks.[4]

In early 2008, NFI approached Ms. Vanderhaeghe about using her name and likeness on its American Sense line. That led to a host of disputes between the parties that the court need not recount here. It suffices to note that for approximately the first six months of 2009, NFI revamped the labels on its American Sense line to include Ms. Vanderhaeghe's name and likeness along with the Sense names. Starting in about July 2009, it removed Ms. Vanderhaeghe's name and likeness, and began marketing each of its American Sense products with the overarching brand name "WomenSense" along with the specific Sense name for the product. The new labels replaced Ms. Vanderhaeghe's likeness with the likenesses of different women.

---

[4] NFI and PNI did not enter a written license agreement until September 17, 2010. Zachary Decl. (Dkt. # 63), Ex. A.

ORDER – 3

At around the same time, PNI changed the labels on its Canadian Sense line.  Like NFI, it removed Ms. Vanderhaeghe's name and likeness.  Like NFI, it used the overarching brand "WomenSense" on each of its products along with the specific Sense name of the product.  Unlike NFI, it did not use the likeness of any woman on its labels.

By January 2010, PNI and NFI had ended their relationship with Ms. Vanderhaeghe.  As the parties' relationship disintegrated, Ms. Vanderhaeghe made no secret of her intent to offer a competing line of women's health supplements.

In the spring of 2010, Ms. Vanderhaeghe launched a line of women's health products in Canada.  Each of her supplements was branded with a name ending in the suffix "SMART," including for example "ESTROSMART," "MENOSMART," and "THRYOSMART."  In other words, Ms. Vanderhaeghe used the same prefixes from the Sense line of products, but used the SMART suffix rather than the Sense suffix.  She also filed intent-to-use applications with the United States Patent and Trademark Office ("PTO") for her SMART trademarks.

Ms. Vanderhaeghe began making preparations to launch a similar line of products in the United States.  The record is scarce as to what preparations she made.  It is undisputed that she has neither sold nor contracted to sell any of her products directly to United States distributors, retailers, or individual customers.  She has not designed labels for any products to be sold in the United States.  Early this year, she made some inquiries to American retailers and an American sales broker.  There is no evidence that those inquiries have led to any agreement or that they are likely to do so.

As matters stand now, the only way for Americans to obtain Ms. Vanderhaeghe's SMART products is to either travel to Canada or purchase the products from a Canadian online retailer who sells to Americans.  There are at least three such retailers.  Although Ms. Vanderhaeghe sells her products to those retailers, there is no evidence that she has any control over the persons to whom they sell her products.  No one, American or Canadian, can purchase products directly from Ms. Vanderhaeghe's website.  Ms.

ORDER – 4

Vanderhaeghe's website contains links to several Canadian online retailers, some of whom sell products to Americans.  The front page of Ms. Vanderhaeghe's website contains an American flag and Canadian flag side by side.  Currently, the American flag links to nothing.  For a brief period earlier this year, the American flag linked to a list of two Canadian online retailers who sell and ship products to Americans.

Although Ms. Vanderhaeghe does not sell products directly to Americans, it would be inaccurate to say that she has not marketed to Americans.  Through her website, she has acquired as many as 30,000 subscribers to whom she periodically emails a newsletter.  In a May 30, 2010 newsletter, she touted her separation from PNI, noting that "[t]he change affects my clients in both Canada and the United States."  McKnight Decl. (Dkt. # 14), Ex. 7.  She urged subscribers not to buy Sense products.  *Id.* ("I have not nor will I ever have anything to do with the WomenSense products in any country.").  She introduced her SMART line, and instructed subscribers about the differences between the products' labels.  *Id.* ("For you to be sure you are getting true Lorna Vanderhaeghe products, just remember, if my name and face are not on the label then the product is not an authentic Lorna Vanderhaeghe product and I cannot vouch for the quality.").  She also claimed she would supply American customers:  "My U.S. customers are able to purchase directly from us by emailing orders@hormonehelp.com while we work to stock health food stores in the U.S. again."  *Id.*  So far as the record reveals, Ms. Vanderhaeghe was puffing when she said she would supply American customers directly.  At most, she directed American customers to Canadian online retailers.  In addition to her website, Ms. Vanderhaeghe has published a number of books on women's health that are available in the United States.  Moreover, her name is known to Americans through her prior promotion of NFI's American Sense line, whose products were labeled with her name and likeness for at least six months in 2009.  Ms. Vanderhaeghe has a substantial presence in the American market, even though she does not yet sell her products directly to Americans.

ORDER – 5

At least part of the reason that Ms. Vanderhaeghe has not done more to advance her American business plans is the legal campaign that NFI and PNI have begun against her. In May 2010, PNI petitioned a court in Vancouver, British Columbia, for an injunction against her use of the SMART marks in Canada. The Canadian court declined to issue an injunction. PNI has appealed that ruling. In June 2010, PNI and NFI brought this suit, and moved for a preliminary injunction the next month. As the court will discuss in its later analysis, this lawsuit has led Ms. Vanderhaeghe to suspend her plans to enter the United States market directly.

The injunction Plaintiffs ask this court to issue is quite broad. It would prevent Ms. Vanderhaeghe from doing anything to promote her SMART products in the United States or Canada, including using the SMART names and the trade dress of the SMART products. Dkt. # 13-2 (Pltfs.' proposed injunction). It would also require her to refrain from "engaging in any acts of unfair competition against PNI or [NFI]." *Id.* It would force her to stop seeking United States trademark registrations for her products, and to "immediately cancel or withdraw" all pending state and federal trademark registrations. *Id.*

Ms. Vanderhaeghe objects not only to the request for injunctive relief, but to the jurisdiction of this court. She lives in Vancouver, British Columbia, and has never lived in the United States. Although she traveled many times to NFI's Washington offices when she promoted NFI's products, there is no evidence that she has been back since the parties' disputes began. Washingtonians can access her website, but nothing on the website targets Washingtonians. Her products are available indirectly to Washingtonians through some Canadian online retailers, but they are equally available to residents of the other 49 states. She contends that she lacks meaningful contacts with Washington, and that this court thus lacks personal jurisdiction over her.

ORDER – 6

## III.  LANHAM ACT AND INJUNCTION ANALYSIS

The court turns first to Plaintiffs' motion for a preliminary injunction.  The court's analysis of Ms. Vanderhaeghe's motion to dismiss draws on many of the findings that support the court's ruling on injunctive relief.

### A.  Preliminary Injunction Standard

The Ninth Circuit has retooled its long-enduring standard for preliminary injunctive relief in the wake of *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008).  The Ninth Circuit standard included a sliding scale on which a movant could compensate for a lesser showing of harm by showing a correspondingly greater chance of success on the merits, and vice versa:

> Under the "traditional" criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008) (citation omitted).  In *Winter*, the Supreme Court rejected the Ninth Circuit standard to the extent that it made injunctive relief available on a showing of a mere possibility of irreparable harm.  129 S.Ct. at 375. Some subsequent Ninth Circuit panels used broad language about the effect of *Winter* on the alternative standard for injunctive relief.  *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009) (noting that "[t]o the extent that our cases have suggested a lesser standard [than the one established in *Winter*], they are no longer controlling, or even viable.") (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).  The panel in *Alliance for the Wild Rockies ("Alliance") v. Cottrell*, 613 F.3d 960 (9th Cir. 2010), took a narrow view of *Winter*.  After reviewing the post-*Winter* landscape in the Ninth Circuit and in other circuits with sliding-scale

ORDER – 7

injunction standards, *id.* at 965-67, the *Alliance* panel "conclude[d] that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*." *Id.* at 968. The "serious questions version of the sliding scale test" requires the movant to demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). The *Alliance* panel explained that a "plaintiff must also satisfy the other *Winter* factors, including the likelihood of irreparable harm." *Id.*

This court applies the following test, consistent with *Winter* and *Alliance*. A preliminary injunction may issue where a party establishes (1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction. A party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor. *Alliance*, 613 F.3d at 968 (as amended Sept. 22, 2010).

The court considers Plaintiffs' request for injunctive relief as a request for three distinct injunctions: one that would bar Ms. Vanderhaeghe's promotion of her SMART products in Canada even where the products never enter the United States, one that would bar her from selling her SMART products directly to Americans, and one that would bar the promotion and indirect sale of her SMART products to United States customers. As the court will discuss in further detail below, it will not issue the first injunction because the sale of SMART products to Canadians is a matter for Canadian courts. It will not issue the second injunction because there is insufficient evidence that Ms. Vanderhaeghe is likely to sell her products directly to United States customers, much less that those not-yet-existent products would be marketed or labeled in a way that violated the Lanham Act. It will not issue the third injunction because the court concludes that even on the

ORDER – 8

narrow strand of this claim for which Plaintiffs have some likelihood of success on the merits, the balance of hardships tips sharply in Ms. Vanderhaeghe's favor.

**B.   The Court Will Not Enjoin Ms. Vanderhaeghe's Sales of Her Products in Canada, As the Court Lacks Jurisdiction Over Those Sales.**

Plaintiffs base their request for injunctive relief solely on their Lanham Act claim that Ms. Vanderhaeghe's SMART products infringe their trademarks and trade dress.  As noted, Plaintiffs seek an injunction that would apply even to Ms. Vanderhaeghe's sales in Canada.  In appropriate circumstances, the Lanham Act can apply to foreign conduct, including sales of products abroad.  *Steele v. Bulova Watch Co.*, 344 U.S. 280, 285-87 (1952).

Ms. Vanderhaeghe's sales of her products in Canada to Canadians are not the appropriate subject of a Lanham Act suit.  The Lanham Act's "broad jurisdictional grant" extends to "all commerce which may lawfully be regulated by Congress."  *Steele*, 344 U.S. at 286.  That jurisdiction can extend to foreign activities if the party invoking the Lanham Act satisfies three requirements: (1) the foreign activity must have some effect on American commerce, (2) that effect must inflict a cognizable Lanham Act injury on the party, and (3) the interest of and links to American commerce must be sufficiently strong in relation to those of other nations.  *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554-55 (9th Cir. 1992).

The court focuses for now on Ms. Vanderhaeghe's sales in Canada, excepting her sales to Canadian online retailers who sell directly to Americans.  To the extent Ms. Vanderhaeghe sells her products in Canada and they remain there, there is no evidence of an effect on American commerce or an injury to Plaintiffs' American interests.  Moreover, it would appear that even PNI acknowledges that Canada has a much greater interest in those sales, as PNI first approached a Canadian court in its quest to stop Ms. Vanderhaeghe's Canadian sales.  That court ruled against PNI, and PNI has appealed to

ORDER – 9

another Canadian court.  This is evidence enough that Ms. Vanderhaeghe's sales to Canadians are beyond the scope of the Lanham Act.  It is possible, of course, that some Americans travel to Canada, purchase her products, and bring them back to the United States.  Plaintiffs have presented no evidence of this practice.  The only evidence of the presence of Ms. Vanderhaeghe's products in the United States is that some Canadian online retailers have shipped them directly to Americans.  The court will address those sales later in this order.  Putting them aside, Plaintiffs have proffered no basis to invoke the Lanham Act to enjoin commercial activity in Canada.

**C.    The Court Will Not Enjoin Ms. Vanderhaeghe's Possible American Product Launch, Because Her Plans Are Too Indefinite To Support an Injunction.**

The court declines to enjoin Ms. Vanderhaeghe's sales of products directly to American customers for two reasons:  she has made no such sales, and although she might do so in the future, her plans are too indefinite for now.  So far as the record reveals, Ms. Vanderhaeghe's plans to expand to the United States have been derailed by this lawsuit.  She declares that as of now, she does not even have labels for her American products.  Vanderhaeghe Decl. (Dkt. # 22) ¶ 54.  Labeling her products for American sale is no simple matter, as she must ensure that they comply with Food and Drug Administration regulations.  Vanderhaeghe Depo. at 84.[5]  There is evidence that Ms. Vanderhaeghe made inquiries to an American retailer and sales broker in April 2010 or earlier.  Matesky Decl. (Dkt. # 58), Exs. L, M.  There is no evidence that anything materialized from these inquiries, or that Ms. Vanderhaeghe has continued similar inquiries since Plaintiffs sued her.  Plaintiffs deposed Ms. Vanderhaeghe in late July 2010.  She testified that she has told potential American business partners that she would not launch a United States product line until this lawsuit "was dealt with."  Vanderhaeghe Depo. at 86.  She said that she would launch her American line "[a]t some point" if this

---

[5] Excerpts from Ms. Vanderhaeghe's deposition are at Exhibit 6 to the Declaration of Cristin Carr and Exhibit 1 to the Declaration of Michael Matesky.  Dkt. ## 32, 39.

ORDER – 10

court denied Plaintiffs' request for an injunction.  *Id.*  She said that she would have to "think about" whether she would wait for this lawsuit to conclude before launching.  *Id.*  Ms. Vanderhaeghe has not yet decided whether she would sell her American products through retailers or online, much less which retailers or other outlets she would use.  *Id.* at 98-99.

On these facts, there is no basis to enjoin Ms. Vanderhaeghe from selling her products in the United States.  The court can infer from Ms. Vanderhaeghe's trademark applications that she intends to use her SMART product names in the United States *if* she sells her products here.  But the court has no basis to conclude that an American product launch is likely to occur.  Discovery in this case commenced on July 9, 2010, and Plaintiffs have obtained no evidence that that Ms. Vanderhaeghe's "plan" to sell in the United States is more than a vague aspiration.  Even if the court believed Ms. Vanderhaeghe's American business plans to be more concrete, the court could not assess the likelihood of confusion arising from a trade dress that undisputedly does not yet exist. Moreover, the court cannot meaningfully assess the likelihood of confusion arising from Ms. Vanderhaeghe's use of the SMART trademarks where the court can only speculate about how she will use those marks in commerce.  To the extent the court could assess the likelihood of confusion arising from the trademarks alone, Plaintiffs would not be likely to succeed on the merits for the reasons the court discusses in the next section.

**D.    The Court Will Not Enjoin Ms. Vanderhaeghe's Sales to Canadian Online Retailers Who Sell to Americans.**

Only Ms. Vanderhaeghe's sales of products to Canadian online retailers who sell to Americans implicates the jurisdictional scope of the Lanham Act and presents a concrete enough dispute for the court to consider injunctive relief.  Before determining whether Ms. Vanderhaeghe has infringed on Plaintiffs' trademarks and trade dress, the court must consider two threshold issues: whether Ms. Vanderhaeghe can be made liable

ORDER – 11

for sales by retailers she does not control, and whether Ms. Vanderhaeghe has ownership rights in Plaintiffs' trademarks.

### 1.   Contributory Infringement

So far as the record reveals, the only way Ms. Vanderhaeghe's products reach the United States is via Canadian online retailers. Several of those retailers ship their products from Canada to Americans. A paralegal working for Plaintiffs' counsel ordered ten different SMART products from one of those retailers, Cureself.ca ("Cureself"). Cureself shipped the SMART products from Canada to the paralegal's Seattle address. They arrived bearing Ms. Vanderhaeghe's Canadian trade dress. The record thus supports the conclusion that Americans can purchase Ms. Vanderhaeghe's Canadian products from third parties in Canada. The record gives the court no basis to assess the volume or geographical extent of those sales. The court has no evidence of the relationship between Ms. Vanderhaeghe and any of these retailers. It has no evidence regarding the degree to which Ms. Vanderhaeghe can control their sales, assuming she can control them at all.

None of the Canadian online retailers are parties to this action; Ms. Vanderhaeghe can be liable for their sales only via the doctrine of contributory infringement. Plaintiffs do not discuss that doctrine. A defendant is liable for contributory infringement where it either intentionally induces the primary infringer to infringe or supplies a product to the primary infringer knowing of the primary infringement. *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)). In this case, there is no evidence that Ms. Vanderhaeghe intentionally induced any retailer to sell to Americans. Indeed, there is no evidence at all about her relationship with any of the Canadian online retailers who sell her product. There is evidence, however, that she is aware that the products she sells to those retailers may be sold to Americans. She certainly knows as much from this lawsuit, as Plaintiffs

ORDER – 12

have provided evidence of the allegedly infringing sales.  Even before this lawsuit, there is evidence that she directed Americans to these online retailers.  For a brief period after Plaintiffs sued, Ms. Vanderhaeghe's website used an American flag link to direct American customers to two of these online retailers.  The court thus finds that, assuming that sales from these online retailers to Americans are infringing, Plaintiffs are likely to succeed in showing that Ms. Vanderhaeghe is liable for that infringement.

### 2.    Ms. Vanderhaeghe is Unlikely to Prove that She Has Rights in Plaintiffs' Trademarks or Trade Dress.

Ms. Vanderhaeghe contends that she developed the Sense trademarks and trade dress either by herself or in collaboration with PNI, and that PNI has improperly claimed sole ownership over them.  There is no dispute that PNI registered United States trademarks for eight Sense products: MenoSense, EstroSense, AdrenaSense, OsteoSense, ThyroSense, ArthriSense, UriSense, and VeinSense.  Parkes Decl. (Dkt. # 13) ¶ 24, Ex. 1.  Registration of a trademark is "prima facie evidence that the registrant is the owner of the mark."  *Sengoku Works Ltd. v. RMC Int'l. Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).  A ninth registration is pending for MagSense.  ArthriSense has apparently never been sold in the United States.  The remaining eight trademarks correspond to the eight products in NFI's American Sense line.

Because Plaintiffs' trademarks are registered, they carry a presumption of validity. *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).  A party challenging a trademark can overcome the presumption if it proves the mark invalid by a preponderance of the evidence.[6]  Ms. Vanderhaeghe contends that PNI committed fraud on the PTO by failing to disclose that she was either the creator or co-creator of the

---

[6] Plaintiffs allege that some of their United States trademarks have become incontestable within the meaning of 15 U.S.C. § 1065.  The court notes that Plaintiffs have provided no evidence that they filed affidavits of incontestability, as the statute requires.  15 U.S.C. § 1065(3).  In any event, the court need not reach the question of incontestability, as an incontestable mark can nonetheless be challenged on numerous grounds, including that "the registration or the incontestable right to use the mark was obtained fraudulently."  15 U.S.C. § 1115(b)(1).

ORDER – 13

trademarks.  She must prove her fraud claim by clear and convincing evidence.  *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).

On the record before the court, Ms. Vanderhaeghe is unlikely to prove that she has rights in Plaintiffs' trademarks or that PNI defrauded the PTO by not stating that she had an ownership interest in the marks.  There is evidence that Ms. Vanderhaeghe contributed to the choice of Plaintiffs' trademarks and trade dress.  The only evidence that she did not cede those contributions to Plaintiffs, however, is Ms. Vanderhaeghe's statements that PNI orally agreed to give her ownership of the marks and trade dress.  She admits that she knew that PNI was registering the marks in the United States, but contends that she "did not appreciate the significance of whose name was attached to the registrations." Vanderhaeghe Decl. (Dkt. # 22) ¶ 32.  On this record, a trier of fact is unlikely to conclude either that Ms. Vanderhaeghe retained an ownership interest in the marks or the trade dress, or that PNI defrauded the PTO.  *See Sengoku Works*, 96 F.3d at 1220 ("[I]n the absence of an agreement between the parties, the manufacturer is presumed to own the trademark.")

### 3. Likelihood of Success on the Merits of Plaintiffs' Lanham Act Claims Targeting Ms. Vanderhaeghe's Indirect Sales

Plaintiffs assert claims under Section 32 and Section 43(a) of the Lanham Act.  11 U.S.C. §§ 1114, 1125(a).  Section 32 governs infringement of registered trademarks, Section 43(a) creates what is "in essence, a federal law of unfair competition" that governs the infringement of registered and unregistered trademarks and trade dress, among other things.  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (Stevens, J., concurring)).  The analysis that applies to claims invoking either section is "oftentimes identical."  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999).  Plaintiffs suggest no difference.  Plaintiffs also

ORDER – 14

do not discuss their state law claim of unfair competition.  The court will follow their lead.

A Section 43(a) claim, whether it targets trademark or trade dress infringement, requires a plaintiff to make three basic showings: "(1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion." *Kendall-Jackson*, 150 F.3d at 1047.

### a.    Distinctiveness

Courts have developed five categories of increasing distinctiveness:  generic, descriptive, suggestive, arbitrary, or fanciful. *Id.*  A mark is arbitrary if it uses known words that have no connection to the product (e.g., "Old Navy" for a clothing store). *Id.* It is fanciful if it consists of a "coined" word or phrase that is not inherently evocative of the product (e.g., "iPod" for a portable music player). *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005).  Suggestive marks do not describe the product, but suggest its features, requiring some degree of imagination to make the suggestive leap (e.g., "Greyhound" for a bus service). *Id.*  Descriptive marks merely describe a feature of the product without engaging the imagination (e.g. "flame broiled" for hamburgers). *Id.* Generic marks do not merely describe a product, but are synonymous with an entire class of products (e.g. "24-Hour News" for an around-the-clock news network).  Marks that are at least suggestive are inherently distinctive, and thus satisfy the distinctiveness requirement automatically. *Kendall-Jackson*, 150 F.3d at 1047.

The court finds that Plaintiffs are likely to succeed in proving that their trademarks are distinctive.  Plaintiffs' trademarks are a conglomeration of a descriptive or suggestive prefix (Uri-, Thryro-, Estro-, etc.) and an arbitrary suffix (Sense).  Taken together, a trier of fact would likely find each of the marks to be at least arbitrary.  As to Plaintiffs' registered trademarks, Ms. Vanderhaeghe is not likely to rebut the presumption that they are valid and thus distinctive. *See Zombondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010).

ORDER – 15

Before considering the distinctiveness of Plaintiffs' trade dress, the court clarifies what trade dress is at issue. Trade dress "refers generally to the total image, design, and appearance of a product, and may include features such as size, shape, color, color combinations, texture, or graphics." *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (internal quotation omitted). The court looks only at the current packaging design for NFI's American line of Sense products. PNI's Canadian trade dresses and NFI's older trade American trade dresses are not relevant.

The trade dress in question consists of an ordinary white plastic pill bottle with a blue cap. The only exception is MagSense, which is in a plastic jar that suggests it holds a cream or salve, and has a white cap. Each product has a label wrapped around it, the primary portion of which has a light purple rectangular band across the top. In every product, the word "WomenSense" is printed in white near the top of the light purple band, and to the left is a photographic likeness of a woman's face. It appears that the products use six different women's likenesses, although the court discerns no pattern in which woman's face is imposed on which Sense products. Superimposed on the light purple band is a smaller rectangle that is either pink, red, or green. Within that smaller rectangle is a single word or phrase printed in white that appears to suggest some feature of the product. Examples include "ANTI-STRESS," "MUSCLE SUPPORT," "THYROID," and "HORMONE BALANCE." Below the purple rectangle is white space enclosed on the right by a light purple border. In the white space, the name of the product is printed (EstroSense, MenoSense, etc.) in black type. Just below that is a descriptive phrase printed in the same color as the smaller rectangle imposed on the purple band. Examples include "THYROID FORMULA," "MENOPAUSE FORMULA," and "BEAUTIFUL LEGS FORMULA." Below that is black type explaining the purpose of the product. Examples include "Natural Support for Hot Flashes & Night Sweats," "Supports Adrenals & Promotes Uninterrupted Sleep," and "Nourishes & Supports Thyroid Health." Just above the purple bottom border is a

ORDER – 16

statement of the number of "Vegetarian Capsules" contained inside the bottle, or in the case of MagSense, a statement of the volume of the container. On some of the products, but not all, there is an outline of a heart in the same color as the smaller rectangle imposed on the upper purple band.[7] "DIETARY SUPPLEMENT" is superimposed in white type on the purple bottom border of each product.

The case for the distinctiveness of Plaintiffs' trade dress is weaker than for the distinctiveness of their trademarks. Unlike their trademarks, Plaintiffs' trade dress is not registered. There is no presumption that unregistered trade dress is distinctive, so Plaintiffs must prove either that it is inherently distinctive or that it has acquired secondary meaning. *Two Pesos*, 505 U.S. at 767; *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 215 (2000) (noting that product packaging can be inherently distinctive, holding that product design cannot). Plaintiffs do not attempt to show secondary meaning in their trade dress, so they must demonstrate that it is inherently distinctive. They make little attempt to do so. They suggest that merely by its nature as product packaging, their trade dress is distinctive. Pltfs.' Mot. at 17 (citing *Wal-Mart*). It is true that the Supreme Court in *Wal-Mart* recognized that in dicta that "the very purpose of encasing [a product] in a distinctive packaging . . . is most often to identify the source of the product." 529 U.S. at 212. The Court did not suggest, however, that all packaging is distinctive. No authority of which the court is aware supports that proposition. No Ninth Circuit decision has squarely addressed how to test packaging for distinctiveness, but the court in *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993) cited favorably to *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980 (D. Ariz. 1992). In *Lisa Frank*, the court considered whether the trade dress was a common or basic shape or design, whether it was unique or unusual among similar goods in the marketplace, and whether it was a commonly adopted or

---

[7] The consistency of Plaintiffs' use of the heart graphic is questionable. For example, the MenoSense packaging on the first page of one exhibit uses the heart graphic, whereas the same packaging on the next page does not. McKnight Decl. (Dkt. # 14), Ex. 2.

ORDER – 17

well-known ornamentation for similar goods.  799 F. Supp. at 988.  Trade dress that "includes arbitrary features that neither assist in describing the product nor assist in its effective packaging . . . is inherently distinctive."  *Id.*

Plaintiffs' trade dress may be inherently distinctive.  The bottles or jars in which the products are packaged are not distinctive, they are indistinguishable from the packaging of all manner of over-the-counter supplements.  The labels, to the extent they are distinctive, can be distinctive only in their use of color, graphics, and placement of text.  Plaintiffs have presented only limited evidence about the trade dress of their competitors.  That evidence suggests to the court that a trier to fact is unlikely to find Plaintiffs' choice of layout or graphics to be particularly distinctive.  The evidence also shows, however, that Plaintiffs' consistent use of a light purple color could distinguish their products in the marketplace.  *Lisa Frank*, 799 F. Supp. at 988-89 ("While, generally, individual colors are not afforded trade dress protection, the use of colors to create a unique overall impression may go beyond 'mere ornamentation' and can be an indicator of source.").  So far as the record reveals, the light purple color is a "common thread" that consumers would understand to suggest that the Sense products are part of the same family.[8]  *Id.* at 989.  That the labels use the overarching brand "WomenSense" increases their distinctiveness as well.  The court thus concludes that there is a likelihood that Plaintiffs will succeed in proving the inherent distinctiveness of their trade dress.  The court concludes, however, that a trier of fact would likely find their trade dress near the low end of the spectrum of inherent distinctiveness.

### b.   Functionality

Plaintiffs' trademarks and trade dress are undisputedly nonfunctional.

---

[8] Plaintiffs' have used three different trade dresses for their American Sense line since 2008, and each varies substantially from the other.  All three of those trade dresses, however, make use of the same light purple color.  That Plaintiffs have switched trade dresses would be relevant if Plaintiffs were relying on proof that their trade dress has acquired secondary meaning, it is not relevant to whether their trade dress is inherently distinctive.

ORDER – 18

### c.     Likelihood of Confusion

Whether considering trademark or trade dress, the court's analysis of the likelihood of confusion takes guidance from the eight *Sleekcraft* factors, first collected in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  They are:

> (1) strength of the mark [or trade dress]; (2) proximity or relatedness of the goods; (3) similarity of sight, sound, and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion.

*Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998); *Clicks Billiards*, 251 F.3d at 1265 (citing six of eight factors in trade dress analysis).  The factors are intended as guideposts only, and the weight to be afforded to each depends on the circumstances of the case.  *See Dreamwerks*, 142 F.3d at 1129 ("The factors should not be rigidly weighed; we do not count beans."); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.").  The court now considers these factors en route to determining whether Plaintiffs are likely to succeed in proving that consumers are likely to be confused by Ms. Vanderhaeghe's indirect sales of her products to Americans.

### i.     Strength of the Mark and Trade Dress

The court has already observed that Plaintiffs' Sense trademarks are likely to be at least arbitrary, if not fanciful.  The court also has observed, however, that Plaintiffs' trademarks consist of a descriptive or suggestive prefix and an arbitrary suffix.  This juxtaposition will be important in the next subsection when the court compares Plaintiffs' marks to Ms. Vanderhaeghe's.

The court has found that Plaintiffs are likely to succeed in proving their trade dress inherently distinctive, but that their trade dress is at the low end of the spectrum of inherent distinctiveness.

ORDER – 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii.     **Similarity of Marks and Trade Dress**

In determining whether trademarks are similar enough to confuse consumers, the court must consider their sight, sound, and meaning as they appear in the marketplace. *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).  Ms. Vanderhaeghe's marks and Plaintiffs' marks are indistinguishable in their prefixes (Meno-, Adrena-, Estro-, etc.) but distinguishable in their suffixes (-Sense and -SMART). Ms. Vanderhaeghe's trademarks are affixed to her products in all capital letters, whereas Plaintiffs' marks are printed in "small cap" style.  As the court has noted, the prefixes of the parties' marks are descriptive or suggestive, and it is only these descriptive or suggestive elements that make the marks similar.  For example, using "thyro" to describe a product to aid thyroid function is not unique to either party.  The same is true of all of the parties' trademark prefixes.  Even assuming Plaintiffs' prefixes are suggestive, they have made no effort to establish that they have secondary meaning.  The record contains many examples of supplements and other products on the market that use many of the same prefixes, suggesting that the prefixes are either descriptive or suggestive but lacking secondary meaning.[9]  The parties' suffixes, Sense and SMART, are similar only in that each starts with the same letter and has five letters.  Both are likely arbitrary in this context, and both likely serve to distinguish Ms. Vanderhaeghe's products from Plaintiffs'.  For example, consumers looking at "EstroSense" and "ESTROSMART" are likely to assume that each comes from a different source.[10]  The court thus concludes that the similarity of the marks weighs against a likelihood of confusion.

As to the parties' trade dress, the similarity is greater.  The most important similarity is that Ms. Vanderhaeghe appears to use the same light purple color on all of

---

[9] Ms. Vanderhaeghe submitted evidence that for each prefix that the parties use, there are dozens of registered trademarks for pharmaceuticals that use that prefix as well.  This evidence carries little weight with the court.  What is relevant is how those prefixes are used in the market.

[10] One of NFI's American products, SexEssentials, does not use the Sense suffix.  The court finds no meaningful similarity between SexEssentials and Ms. Vanderhaeghe's SEXSMART product.

ORDER – 20

her product labels that NFI uses on its American Sense labels. To be sure, she uses the color somewhat differently. There is no purple at the topmost portion of her label. Her first use of the color is in a rectangle below a pink or red rectangle at the top of the label. The name "LORNA VANDERHAEGHE" is printed in white inside the purple rectangle. In the pink or red rectangle is a phrase that is identical or nearly identical to a suggestive phrase found on the corresponding NFI product. For example, Ms. Vanderhaeghe's ADRENASMART label bears the word "ANTI-STRESS," just as Plaintiffs' AdrenaSense product does. A photographic likeness of Ms. Vanderhaeghe appears to the left of the red and purple rectangles in essentially the same location as the likenesses of other women that appear on Plaintiffs' labels. There is no purple right border on Ms. Vanderhaeghe's labels, unlike Plaintiffs' labels. Both parties use a purple bottom border. Both parties use white space between the top and bottom of the label to state the name of the product and give a brief description of its purpose. Unlike Plaintiffs' labels, Ms. Vanderhaeghe's labels repeat that description in French. Ms. Vanderhaeghe's labels do not use a heart graphic, and do not use a unifying brand name like "WomenSense." Both labels are affixed to white pill bottles, although Ms. Vanderhaeghe's bottles have white rather than blue lids. Considering all of these similarities and differences together, the court finds the parties' trade dresses to be somewhat similar overall, although the prominent display of Ms. Vanderhaeghe's name[11] and likeness is a strong factor differentiating the labels.

### iii.   Evidence of Actual Confusion

The court finds only no evidence of actual confusion in this case. Plaintiffs point out that Ms. Vanderhaeghe briefly used photos of a previous iteration of Plaintiffs'

---

[11] Plaintiffs first ceded that Ms. Vanderhaeghe owned the trademark on her own name, and then backed away from that concession. *Compare* Parkes Decl. (Dkt. # 30) ¶ 7 (admitting that he agreed that Ms. Vanderhaeghe would own the trademark in her name) *with* Parkes Decl. (Dkt. # 66) ¶ 3 (stating that transfer of ownership in trademark had not been accomplished). In any event, Plaintiffs make no argument in these motions that they can prevent Ms. Vanderhaeghe from using her own name on her own products.

ORDER – 21

American trade dress when describing her SMART products on her website.  Surely Plaintiffs do not mean to suggest that Ms. Vanderhaeghe herself was confused about which products were hers?  Even if this were evidence of actual confusion, the evidence shows that Ms. Vanderhaeghe cured this likely mistake in May 2010, and that it has not been repeated since.  Similarly, Cureself at one point marketed Ms. Vanderhaeghe's products on its website in a way that suggests it was confused over the status of the relationship between Ms. Vanderhaeghe and PNI.  It advertised many of Ms. Vanderhaeghe's products as new versions of PNI's products.  It advertised GLUCOSMART, for example as "formerly GlucoSense."  It also used, in a single isolated instance, a photograph of PNI's former Canadian trade dress in connection with one of Ms. Vanderhaeghe's products.  Again, this does not suggest that anyone has been confused by Ms. Vanderhaeghe's trade dress or trademarks, it suggests that a retailer was less than accurate about the status of the relationship between Ms. Vanderhaeghe and PNI.  Moreover, there is no evidence that Ms. Vanderhaeghe is responsible for the retailer's misimpression.  There is also no evidence that mistakes like these have persisted beyond May of 2010.

There is no evidence that any consumer encountering the parties' brands in the marketplace has confused one for the other.  Indeed, at least one consumer has seized on the difference.  NFI received a letter from an American retailer to whom a customer had returned a bottle of MenoSense.  McKnight Decl., Ex. 8 (Jun. 2010 email string).  That customer brought a copy of Ms. Vanderhaeghe's May 30, 2010 newsletter describing her separation from Plaintiffs and urging consumers not to purchase Plaintiffs' products.  In other words, there is evidence that Ms. Vanderhaeghe has succeeded in her efforts to distinguish her products from Plaintiffs'.

### iv.    Proximity or Relatedness of the Goods

The parties' products are very similar.  They mirror each other, almost on a product-by-product basis.  This factor weighs in Plaintiffs' favor.

ORDER – 22

### v.   Marketing Channels

There is no evidence of any market outlet where NFI's American Sense line competes directly with Ms. Vanderhaeghe's products.  The online retailers that sell SMART products do not, so far as the record reveals, sell American Sense products.  *See Sleekcraft*, 599 F.2d at 353 (noting lack of "evidence in the record that both [product] lines were sold under the same roof").

To the extent that the parties share marketing channels, the record suggests that Ms. Vanderhaeghe works hard to distinguish her products from Plaintiffs'.  Ms. Vanderhaeghe uses her website to trumpet her separation from Plaintiffs, and urges consumers to buy her products, not Plaintiffs'.  It is likely she does the same when meeting with or otherwise contacting potential retailers and distributors.  Ms. Vanderhaeghe's name appears to be relatively well known in this market niche, as is her prior association with Plaintiffs.  The record supports the conclusion that Ms. Vanderhaeghe knows as much, and has labored to emphasize her separation from Plaintiffs, not to obscure it.

### vi.   Type of Goods and Purchaser Care

The court has little evidence to assess this factor.  Plaintiffs insist that customers take little care in selecting supplements like theirs, whereas Ms. Vanderhaeghe insists that they do.  Neither party has offered evidence to support their viewpoint.

### vii.   Likelihood of Expansion

Ms. Vanderhaeghe would like to expand her line to the United States, but her plans are indefinite at best.  If she did expand, her products would likely directly compete with Plaintiffs', perhaps even in the same virtual and bricks-and-mortar outlets.

### viii.   Intent

The court finds that evidence of Ms. Vanderhaeghe's intent in selecting her trademarks and trade dress weighs slightly in Plaintiffs' favor.  She was unquestionably aware of Plaintiffs' trademarks and trade dress.  Her choice of parallel product names for

ORDER – 23

her parallel product line was no accident.  Nor was her choice of labels that are similar to Plaintiffs' American Sense labels.  She chose those labels for her *Canadian* product line, however, and Plaintiffs' Canadian product labels are much different than their American counterparts.  Ms. Vanderhaeghe's labels are easily distinguished graphically from Plaintiffs' Canadian labels.  She does, however, use many of the same descriptive phrases on her labels as appear on Plaintiffs' Canadian and American labels.  There is no question that Ms. Vanderhaeghe could have done more to distinguish her product line from Plaintiffs.  The court has already noted, however, that Ms. Vanderhaeghe has endeavored in other forums to distinguish her products from Plaintiffs, which weighs against a finding that she intends to confuse anyone.

### ix.    Summary of Likelihood-of-Confusion Analysis

Plaintiffs are unlikely to succeed on the merits of their claim for trademark infringement.  Plaintiffs have no monopoly on the use of the prefixes they use for their product line, and the parties have chosen different arbitrary suffixes.  Even though the products are very similar, the court finds that consumers are likely to distinguish the trademarks.

Plaintiffs are more likely to succeed on the merits of their trade dress claims.  Ms. Vanderhaeghe's use of the same light purple unifying color, a similar graphical scheme, and identical or nearly identical descriptive phrases is likely to promote confusion.  This is especially so given the similarities of the products.  Her use of her name and likeness on her labels, however, promotes differentiation between her products and Plaintiffs'.  On balance, the court finds that Plaintiffs make a stronger showing of likelihood of confusion as to their trade dress.  The court concludes that they are likely to succeed on their trade dress claims, but only marginally so.

### 4.    Irreparable Harm Arising From Ms. Vanderhaeghe's Indirect Sales

The court may presume irreparable injury where a plaintiff shows a likelihood of success on the merits of a trademark or trade dress infringement claim.  *Brookfield*, 174

ORDER – 24

F.3d at 1066.  As to Plaintiffs' trademark infringement claim, they have not shown a likelihood of success on the merits, and are not entitled to a presumption of irreparable harm.  The court also finds that they have not proven irreparable harm.

Plaintiffs' trade dress infringement claim is entitled to a presumption of irreparable harm.  The court notes that but for the presumption, Plaintiffs would fall far short of meeting their burden to show irreparable harm.  Plaintiffs have not assessed the extent to which Ms. Vanderhaeghe's products are entering the United States.  Indeed, the court has no evidence that any American other than Plaintiffs' counsel's paralegal has received her products.  Without having any basis to assess the extent of infringing activity, the court has no basis to conclude that Plaintiffs are suffering a harm that would be deemed irreparable.  Plaintiffs thus rely solely on a presumption of harm.

For purposes of this order, the court will apply a presumption of harm despite concerns over the presumption's continued vitality.  Ms. Vanderhaeghe argues that in the wake of *Winter*, courts may no longer presume irreparable harm, even in trademark cases.  Some district courts have taken that view.  *E.g.*, *Edge Games, Inc. v. Elec. Arts, Inc.*, No. C 10-2614 WHA, 2010 U.S. Dist. LEXIS 108727, at *36 (N.D. Cal. Oct. 1, 2010); *Jacobsen v. Katzer*, 609 F. Supp. 2d 925, 936 (N.D. Cal. 2009) (declining to apply presumption of harm in copyright case).  By contrast, a Ninth Circuit panel has recently applied *Winter* and a trademark presumption of harm.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009).  In light of the court's rulings on the other factors governing equitable relief, the court need not decide whether *Winter* bars litigants from relying on a presumption of harm.

### 5.    Balance of Equities

The balance of equities strongly favors Ms. Vanderhaeghe.  As the court has already noted, it has no basis to assess the extent of Ms. Vanderhaeghe's indirect sales to Americans.  There is no evidence, moreover, that Ms. Vanderhaeghe has any control over the sales of the Canadian online retailers who sell her products to Americans.  An

ORDER – 25

injunction requiring her to stop those sales might well require her to stop selling her products to online retailers entirely, which is a substantial hardship given that the court has no basis to stop Ms. Vanderhaeghe's sales of products to Canadians.  The court cannot, on the record before it, conceive of an injunction that would not substantially infringe on the Canadian court's ruling that she is permitted to sell her products in Canada.  Plaintiffs could have taken discovery to determine if a narrowly drafted injunction could cut off Ms. Vanderhaeghe's indirect sales to Americans without impinging on her right to sell those products to Canadians.  They have not done so. Plaintiffs, as the court has already noted, have failed to provide evidence of any hardship to them arising from indirect sales of Ms. Vanderhaeghe's products to Americans.  The court therefore concludes that the balance of hardships tips sharply in Ms. Vanderhaeghe's favor.

The court notes, moreover, that even if the court were inclined to enjoin Ms. Vanderhaeghe's sales to online retailers, there is no evidence that this would stop those retailers from acquiring her products.  Retailers sell her products to Americans, suggesting that there is a demand for them.  Retailers wishing to fulfill that demand need not buy from Ms. Vanderhaeghe, they can buy from anyone to whom she sells.  It is not clear from the record that an injunction would stop online sales from Canada to Americans, the only conduct that is currently impinging Plaintiffs' Lanham Act interests.

### 6.    Public Interest

The court finds no particular public interest factors weighing in either party's favor.  Plaintiffs point out that because their products have different formulations than Ms. Vanderhaeghe's, there is a public interest in ensuring that consumers do not confuse their products.  There is no evidence, however, that the parties' products differ at all in their efficacy.

ORDER – 26

### 7.     Summary of Analysis of Plaintiffs' Effort to Enjoin Ms. Vanderhaeghe's Indirect Sales to Americans

The court declines to enjoin Ms. Vanderhaeghe's indirect sales to Americans.  The sole claim for which Plaintiffs have established a likelihood of success on the merits is their claim for trade dress infringement.  The court does not find a strong likelihood of success even on that claim.  Plaintiffs have proven irreparable harm only because they enjoy a presumption of irreparable harm.  The balance of hardships, however, strongly favors Ms. Vanderhaeghe.  Ms. Vanderhaeghe should not be forced to forego lawful foreign product sales merely to permit Plaintiffs to cut off an unknown volume of sales to Americans.

In light of these conclusions, the court need not address Ms. Vanderhaeghe's effort to invoke the equitable defenses of laches and unclean hands.

Before moving on to Ms. Vanderhaeghe's motion to dismiss for lack of personal jurisdiction, the court summarizes its rulings as to injunctive relief.  First, the court does not have jurisdiction over Ms. Vanderhaeghe's sales of her products to Canadians.  That is a matter for the Canadian court system.  Accordingly, the court will grant no injunction as to those sales.  Second, as to Ms. Vanderhaeghe's plans to enter the United States market by directly selling her products to Americans, the court finds her plans too indefinite to support an injunction.  Finally, as to Ms. Vanderhaeghe's indirect sales to Americans via Canadian online retailers, the court declines to grant an injunction for the reasons just stated.

### IV.   PERSONAL JURISDICTION ANALYSIS

In a case like this one, where no federal statute governs personal jurisdiction,[12] the court begins its personal jurisdiction analysis with the "long-arm" statute of the state in which the court sits.  *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002).  Washington's long-arm statute (RCW § 4.28.185)

---

[12] The Lanham Act contains no provision addressing personal jurisdiction.

ORDER – 27

extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits. *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989).

Also relevant in this case is Federal Rule of Civil Procedure 4(k)(2), which is sometimes referred to as the federal long-arm statute. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. Cal. 2006). It provides as follows:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

There are two species of personal jurisdiction: specific and general. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 & n.9 (1984). Both species depend on the defendant's contacts with the forum state. "[S]pecific jurisdiction is tethered to a relationship between the forum and the claim," whereas general jurisdiction is not. *Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007). A defendant with "substantial" or "continuous and systematic" contacts with the forum state is subject to general jurisdiction, and can be haled into court on any action, even one unrelated to its contacts in the state. *Bancroft & Masters*, 223 F.3d at 1086. A defendant not subject to general jurisdiction may be subject to specific jurisdiction if the suit against it arises from its contacts within the forum state. *Id.*

When faced with a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003). A plaintiff must provide evidence that, if believed, would support the court's exercise of jurisdiction.

ORDER – 28

*Id*. at 1129.  The court need not accept a plaintiff's bare allegations if the defendant controverts them with evidence.  *See AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).  If both parties provide evidence supporting different versions of a fact, however, the court must resolve competing inferences in a plaintiff's favor.  *Harris Rutsky*, 328 F.3d at 1129.  If appropriate, the court must grant a party's request for an evidentiary hearing to determine personal jurisdiction.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284-85 (9th Cir. 1977).  Ms. Vanderhaeghe has made no such request, and thus the court resolves all competing evidentiary inferences in favor of Plaintiffs.

The court has so far referred to Ms. Vanderhaeghe herself without recognizing that two corporate entities have been named as Defendants as well:  Headline Promotions Ltd. ("HPL") and Lorna Vanderhaeghe, Inc.  According to Ms. Vanderhaeghe, the latter corporation does not exist.  Plaintiffs understandably believed that Lorna Vanderhaeghe, Inc., existed, because (among other evidence) many of Ms. Vanderhaeghe's product labels affix a copyright notice in favor of that corporation.  Nonetheless, Ms. Vanderhaeghe has provided uncontroverted evidence that the corporation does not exist.  This order will conclude with a directive that the clerk dismiss Lorna Vanderhaeghe, Inc.

HPL exists and is the corporate entity through which Ms. Vanderhaeghe conducts the business activity relevant to this lawsuit.  Plaintiffs have pointed to no relevant action that Ms. Vanderhaeghe took in her personal capacity, rather than in her capacity as an officer of HPL.  Some states recognize limits on personal jurisdiction over individuals acting in a corporate capacity.  *See Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520-21 (9th Cir. 1989) (discussing whether Arizona law supports a "fiduciary shield" doctrine).  The Due Process Clause does not create such limits.  *Id.*  In states like Washington, where the law extends personal jurisdiction to the limits of the Due Process Clause, an individual enjoys no protection from jurisdiction in suits over conduct in her corporate capacity.  *Whalen v. Nat'l Occupational Health Strategies, LLC*, No. C05-915RSM, 2006

ORDER – 29

U.S. Dist. LEXIS 5931, at *5-6 (W.D. Wash. Jan. 24, 2006); *Huebner v. Sales Promotion, Inc.*, 684 P.2d 752, 757 (Wash. Ct. App. 1984) (finding individual defendants subject to personal jurisdiction for actions taken in their corporate capacity). Because there is no evidence of any HPL action that Ms. Vanderhaeghe did not execute, the court's remaining jurisdictional analysis does not distinguish those two Defendants.

Plaintiffs suggest four routes to asserting personal jurisdiction over Ms. Vanderhaeghe. They contend that she is subject to specific and general jurisdiction via Washington's long-arm statute and that she is subject to specific and general jurisdiction in Washington via Rule 4(k)(2). These allegations are mutually exclusive, because if Ms. Vanderhaeghe is subject to jurisdiction via Washington's long-arm statute, she cannot be subject to Rule 4(k)(2), which by its terms applies only when "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A).

Plaintiffs all but concede that Ms. Vanderhaeghe is not subject to general jurisdiction in Washington. A plaintiff must meet an "exacting standard" in proving general jurisdiction, because a finding of general jurisdiction is a finding that the defendant can be forced to appear in the forum state to "answer for any of its activities anywhere in the world." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004). Plaintiffs have not attempted to meet this exacting standard, they merely insist that further discovery would reveal Ms. Vanderhaeghe to be subject to general jurisdiction. The court disagrees.

The court finds, however, that it has specific jurisdiction via Washington's long-arm statute. A three-part test governs a court's consideration of specific jurisdiction:

> (1)   The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or [a] resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

ORDER – 30

2)      the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)     the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).  In a trademark infringement case, a court typically considers whether the defendant purposefully directed conduct at the forum state.  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998).  A plaintiff seeking to prove purposeful direction must satisfy the "effects test," which is derived from *Calder v. Jones*, 465 U.S. 783 (1984):

> The defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

*Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). (quoting *Schwarzenegger*, 374 F.3d at 803).

In this case, the most important jurisdictional contact is Ms. Vanderhaeghe's alleged decision to sell her products to Canadian online retailers knowing that they would be resold to Americans and thus infringe trademarks licensed to NFI, a Washington corporation.  This is merely an allegation, and one that Ms. Vanderhaeghe disputes.  Nonetheless, Plaintiffs have provided at least some evidence to support the allegation, and the court must therefore accept it as true in this context.  Engaging in acts of trademark infringement in one forum is not necessarily sufficient to subject a party to personal jurisdiction in the trademark holder's home forum.  *Panavision*, 141 F.3d at 1322.  Courts have held, however, that the addition of infringing activity in the forum state is a sufficient basis for jurisdiction.  *Dakota Indus., Inc., v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991) ("The fact that some of the 'passing off' occurred in South Dakota, along with the fact that [plaintiff's] principal place of business is in South Dakota, demonstrates that [defendant's] actions were uniquely aimed at the forum state

ORDER – 31

and that the 'brunt' of the injury would be felt there, as required by *Calder*.").  Similarly, the *Panavision* court favorably cited *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410 (7th Cir. 1994), in which a Maryland defendant was subject to personal jurisdiction in Indiana by virtue of its national television broadcasts of its football team, whose name was alleged to infringe the Indianapolis Colts' trademarks.  141 F.3d at 1321-22.  Knowing infringement of a plaintiff's trademarks, coupled with infringing activity in the plaintiff's home state, is sufficient to subject a defendant to jurisdiction there.  Here, Ms. Vanderhaeghe is aware that her allegedly infringing products have been sold to Washington residents, and is aware that NFI is headquartered here.

Plaintiffs' claims undisputedly arise, at least in part, from Ms. Vanderhaeghe's allegedly infringing indirect sales to Washington residents.  Not every aspect of a suit must arise from a defendant's forum contacts; it suffices if a part of the injury would not have occurred but for activity in the forum.  *Gordy v. Daily News, L.P.*, 95 F.3d 829, 835 (9th Cir. 1996).  For example, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773 (1984), a New York resident sued a nationwide publication for libel in New Hampshire because New Hampshire was the only state under whose statute of limitations the suit was timely.  Even though it was "undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire," *id.* at 780, the court found the lesser harm arising out of the defendant's New Hampshire activities sufficient for the exercise of personal jurisdiction.  Here, Plaintiffs suffered at least some of the harm from Ms. Vanderhaeghe's alleged infringement in Washington, and their suit arises from that harm.

Finally, the court considers whether it is unreasonable to subject Ms. Vanderhaeghe to jurisdiction in Washington.  The plaintiff bears the burden to satisfy the first two requirements of the specific jurisdiction test.  If the plaintiff succeeds, the burden shifts to the defendant to show that the exercise of jurisdiction would be

ORDER – 32

unreasonable. *Bancroft & Masters*, 223 F.3d at 1088.  Seven factors are relevant to the reasonableness inquiry, although none is dispositive:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487-88 (9th Cir. 1993).  The defendant must make a "compelling case" of unreasonableness.  *Bancroft & Masters*, 223 F.3d at 1088 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Ms. Vanderhaeghe has not made a compelling case that it is unreasonable to subject her to suit in Washington.  Given the attenuated chain of distribution by which her products currently reach Washington, the extent of her purposeful interjection into Washington is limited.  Ms. Vanderhaeghe and her business are located in British Columbia, not far from Washington.  She has made no compelling showing that defending herself in this forum would be particularly burdensome.  Because this court has already limited its jurisdiction to Ms. Vanderhaeghe's sales to Americans, there is no conflict with Canadian sovereignty.  Disputes over Ms. Vanderhaeghe's Canadian sales will be adjudicated in Canada, not here.  Washington has a plain interest in adjudicating the Lanham Act claims of its residents.  There is no suggestion that resolving the parties' disputes over American commerce in this forum would be inefficient.  A Washington forum plainly serves Plaintiffs' interests in convenient and effective relief.  Finally, no one points to an alternate forum to adjudicate claims related to Ms. Vanderhaeghe's American commerce.  Considering all of these factors, the court finds it not unreasonable to exercise personal jurisdiction over Ms. Vanderhaeghe.

Alternatively, the court concludes that if Ms. Vanderhaeghe were not subject to jurisdiction in Washington via the state's long-arm statute, she would be subject to

ORDER – 33

jurisdiction in Washington via Rule 4(k)(2).  Ms. Vanderhaeghe's American trademark applications, her admitted desire to enter the American marketplace, and her indirect sales of her products to Americans would subject her to jurisdiction via Rule 4(k)(2).

Finally, the court notes that Ms. Vanderhaeghe has attempted to fracture the court's jurisdiction by suggesting that Plaintiffs must prove that she has jurisdictionally sufficient contacts as to each claim Plaintiffs bring.  She is mistaken.  A court must have personal jurisdiction over a defendant with respect to all claims.  *Data Disc*, 557 F.2d at 1289 n.8.  The court may, however, in its discretion, exercise "pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). To the extent that the court lacks personal jurisdiction over Ms. Vanderhaeghe with respect to any claim, it finds all of Plaintiffs' claims sufficiently related to exercise pendent personal jurisdiction.

## V.  CONCLUSION

For the reasons previously stated, the court DENIES Plaintiffs' motion for a preliminary injunction and DENIES Defendants' motion to dismiss.  Dkt. ## 9, 13.  The court directs the clerk to dismiss Lorna Vanderhaeghe, Inc. as a party to this action.

DATED this 22nd day of November, 2010.

The Honorable Richard A. Jones
United States District Judge

ORDER – 34